## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **SHANNA M. HILTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 10-CV-618-PJC** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner of the** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### OPINION AND ORDER

Claimant, Shanna M. Hilton ("Hilton"), pursuant to 42 U.S.C. § 405(g), requests judicial

review of the decision of the Commissioner of the Social Security Administration

("Commissioner") denying Hilton's application for disability benefits under the Social Security

Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have

consented to proceed before a United States Magistrate Judge. Any appeal of this order will be

directly to the Tenth Circuit Court of Appeals. Hilton appeals the decision of the Administrative

Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly

determined that Hilton was not disabled. For the reasons discussed below, the Court

**REVERSES AND REMANDS** the Commissioner's decision.

### Claimant's Background

Hilton was 38 years old at the time of the hearing before the ALJ on June 24, 2009, in

Tulsa, Oklahoma. (R. 469). Hilton had completed high school and some college courses. (R.

470). She was married and had five children living at home. *Id.* She had last been employed as

a caregiver for a disabled woman, but quit due to the physical demands of the job and because

she was pregnant.  (R. 471).  She claimed the onset of her disability was March 15, 2005.  (R. 468).  Hilton testified that she was disabled due to problems with her vision, hands, back, legs, anxiety, depression, and an overactive bladder.  (R. 472, 478).

Hilton testified that she suffered from glaucoma.[1]  (R. 472).  She stated that she was unable to keep her eyes focused longer than 20 to 30 minutes before her vision became blurry. (R. 472-73).  Glaucoma additionally caused Hilton to lose her peripheral vision, with the greatest vision loss in her left eye.  *Id.*

Hilton stated she suffered neck pain since a 1990 automobile accident.  (R. 475).  She believed that problems with her neck caused her to have headaches.  *Id.*  She suffered a bad headache two to three times a week, with pain that started at the back of her neck and radiated to her head.  (R. 475).  Her headaches generally took two to three hours to pass, but occasionally her pain lasted up to eight hours.  *Id.*  She tried to relieve her headaches with pain medication and by lying down.  *Id.*  Hilton believed that her neck pain and the tension in her neck caused her hands and arms to go numb.  (R. 473-74).  Writing, gripping, and repetitive use of her hands caused them to tingle and to feel numb.  (R. 473).  She had difficulty gripping.  (R. 473-74). Hilton had more difficulty with her right hand and arm than her left.  *Id.*

After the 1990 auto accident, Hilton suffered "excruciating" aching and throbbing pain in her mid and low back.  (R. 475-76).  Hilton's back problems caused her back muscles to spasm and her right leg to feel numb occasionally.  (R. 476).  Hilton testified that she had tingling and numbness in her feet if she stood for longer than 20 to 30 minutes.  *Id.*  She had to sit down if she

---

[1]Glaucoma is "[a] group of eye diseases characterized by increased intraocular pressure, which results in atrophy of the optic nerve and may result in blindness." Taber's Cyclopedic Medical Dictionary 804 (17th ed. 1993).

walked longer than 20 to 30 minutes.  *Id*.  She testified that she was only able to sit for 20 to 30 minutes at a time.  (R. 476-77).  She would have an "excruciating" backache if she did anything that required her to bend over, pull, or lift more than 15 to 20 pounds.  (R. 476-78, 487).  She testified that she was able to lift her 62-pound three-year-old child, but the motion aggravated her back.  (R. 477, 487).  She spent a large portion of her day lying down because the position took pressure off her back and feet.  (R. 477, 483).  Hilton testified that being on her back was the most comfortable position for her.  (R. 477).  She was 40 to 50 pounds overweight, and she felt that her excess weight contributed to her back problems.  (R. 482).  Hilton said her doctor had recommended she have breast reduction surgery, but she was unable to have the surgery due to lack of insurance and money.  (R. 492).

Hilton testified that she suffered from an overactive bladder and gynecological problems after the 1990 automobile accident.  (R. 475, 479).  The bladder problem caused her to use the restroom 10 to 15 times a day, and she had to get out of bed two to three times nightly to urinate.  (R. 478).  Hilton testified that she had excessive blood flow during the seven to ten days of her monthly menstrual cycle.  (R. 478-79).  Hilton's gynecological problems caused her to have increased back pain and to frequently soil her clothing.  (R. 479).  Hilton said she felt tired and sleepy during her menstrual cycle.  *Id*.  She said she had been diagnosed with anemia.  *Id.*

Hilton stated that she had been placed on thyroid hormone replacement treatment because her thyroid gland was removed due to thyroid cancer.  (R. 480).  She felt that the hormone treatment had not returned her body to normal function.  *Id.*

Family & Children Services provided Hilton weekly counseling and medications to treat her symptoms of depression, insomnia, and anxiety.  (R. 480-81).  Hilton said that her doctor had given her medications because of the stress in her life.  *Id.*  She felt that she gained excessive

3

weight due to depression.  (R. 482).  Hilton thought the side effects of medication, depression, and gynecological issues caused her to feel fatigued.  (R. 479, 484).  She slept five to eight hours each night, but woke up feeling tired and sluggish.  *Id.*  Hilton stated that depression and anxiety were "overwhelming," and she had to take a two- to three-hour daily nap.  (R. 479, 481, 483).  She went through periods of depression when she did not bathe.  (R. 483).  She had been hospitalized because of a sustained panic attack.  (R. 483).  She was prescribed medications for symptoms of insomnia.  (R. 479, 484).  Hilton said she had problems with her short-term memory.  (R. 475).

Hilton provided care for her disabled husband and two of her children who required special care.  (R. 470, 483, 485-86).  Her 14-year-old child suffered from Tourette's Syndrome. (R. 486).  She managed her children's medications and schedules, and she attended their doctor appointments.  *Id.*  She testified that she prepared her family quick and easy meals, because she was unable to stand for long periods.  (R. 483).  She was able to do household chores.  (R. 483-84).  Hilton testified that her children had to help out around the house.  (R. 483).  Her activities included reading her bible, helping her children with their homework, and watching television. (R. 483-84).  She was able to drive, but testified that "most of the time" someone accompanied her to help her see on her left side.  (R. 487).  She and her husband did the shopping.  (R. 484). She enjoyed going to church and singing in the church choir.  (R. 482).  She attended Wednesday night choir practice at church, but stated she was unable to attend choir practice or church services when she had increased symptoms of depression.  (R. 482-83, 485, 492).  On occasion she visited with friends and family, but she did not belong to any clubs or organizations, and she did not have any hobbies.  (R. 485).  She said that most days she could not function and stayed at home.  (R. 481).  She left her home for doctor appointments and on occasions when she "had to

leave." *Id*.

On August 18, 1990, Hilton was involved in an automobile accident and was in a coma when she was transported by life flight to Saint Francis Hospital.  (R. 124-53).  She was admitted to the Intensive Care Unit and placed on a respirator.  (R. 137, 148-53).  Hilton was 22-weeks pregnant.  (R. 137).  She had suffered a fractured right clavicle, left and right parietal brain hematomas, and right temporal contusion.  *Id*.  During Hilton's approximate one-month hospital stay, she received speech-language therapy, occupational therapy, and physical therapy.  (R. 124-29).  Hilton's parents cared for her after she was discharged from the hospital.  (R. 134). Following Hilton's discharge, she continued to attend outpatient therapy two to three times a week for approximately two months.  (R. 120-23,  134).

Terry G. Shaw, Ph.D. of Kaiser Rehabilitation Center conducted a neuropsychological evaluation on Hilton on November 29, 1990.  (R. 120-23).  Hilton reported that she experienced chronic and sharp headaches, episodic occasions of dizziness, blurry vision, and pain in her right shoulder and right side.  (R. 120).  She additionally complained of problems with her memory, difficulty with her balance, and a low frustration tolerance.  *Id*.  Dr. Shaw determined that Hilton had a low average ability to focus her attention and concentration.  (R. 121).  Hilton had spatial and cognitive/personality deficits, and mild to moderate cognitive and sensory-motor deficits. (R. 122-23).  Dr. Shaw concluded that Hilton had suffered a right hemispheric brain injury.  (R. 123).  He recommended that Hilton continue with speech therapy, occupational therapy, and physical therapy.  *Id*.  He believed that Hilton would benefit from psychological consultation.  *Id.*

After a April 15, 2004 right thyroid lobectomy, pathology reports confirmed Hilton had carcinoma of the thyroid, and she underwent a left thyroidectomy at Hillcrest Medical Center on June 17, 2004.  (R. 154-73).

Hilton presented to Tulsa Regional Medical Center's ("TRMC") Emergency Room for complaints of sharp, left shoulder and upper arm pain, and neck pain on April 18, 2005.  (R. 194-99).  She reported that she had a racing heart and palpitations.  (R. 197).  She was diagnosed with hypothyroidism.  (R. 195).

Hilton was examined at Triad Eye Clinic ("Triad") on March 25, 2005 for evaluation of possible glaucoma.  (R. 278).  The doctor started Hilton on the medication Lumigan.  *Id.*  Hilton reported she was doing well during her April 27, 2005 follow-up appointment.  (R. 277).  The doctor discontinued Hilton's use of Lumigan because of her pregnancy.  *Id.*  On July 8, 2005, Lee Bottem, D.O. at Triad diagnosed Hilton with bilateral optic nerve damage and prescribed her Alphagan.  (R. 276).

Hilton was diagnosed with hypothyroid, obesity, constipation, glaucoma, and bladder spasms on January 11, 2006 at Oklahoma State Health Care Center (the "OSU Family Clinic").  (R. 255-56)

During Hilton's February 2, 2006 ophthalmology evaluation at Triad, she reported that she experienced minor headaches and difficulty focusing her eyes.  (R. 275).  She reported that she had been out of her medication for six months, so her doctor restarted her on Lumigan.  *Id.*

At Hilton's March 15, 2006 appointment at the OSU Family Clinic, she reported that she had been using Levothroid for one month and had experienced more than two months of dull, left-sided chest pain.  (R. 247-52).  She underwent diagnostic testing on March 15 and March 16, 2006, and was given samples of the medication Crestor.  (R. 250).  Her doctor reviewed her lab work the following day and instructed her to go the emergency room at TRMC for cardiac evaluation.  (R. 247-48,  269).  Hilton's test results showed her chest pain was not cardiac related.  (R. 174-86).  She was diagnosed with hypothyroidism.  (R. 184).

6

Hilton's March 22, 2006 stress test and March 27, 2006 nuclear imaging exercise stress test were normal.  (R. 174-77).  Results of MRI testing of Hilton's skull and brain on March 27 and March 30, 2006 were unremarkable.  (R. 202-08, 210, 273).

Hilton complained of chest pain, chest palpitations, fatigue, heavy menstrual flow, constipation, and dry skin during her April 26, 2006 appointment at the OSU Family Clinic.  (R. 245-46).  She was diagnosed with continued hypothyroidism.  *Id*.  The doctor determined Hilton's chest pains were from stomach problems.  (R. 246).  She was instructed to take over-the-counter Prilosec.  *Id*.

At Hilton's appointment at the OSU Family Clinic on May 24, 2006, she reported that she continued feeling fatigued, weak, and shaky and that she had leg cramps, low appetite, and brittle hair.  (R. 243-44).  Hilton reported that she used Levothroid as prescribed, but she continued to feel cold most of the time.  (R. 243).  Her medication was switched to Levothyroxine.  (R. 244).

Hilton reported at her June 21, 2006 appointment at the OSU Family Clinic that she was doing well on her medications.  (R. 241-42).  She was diagnosed with high cholesterol and prescribed Crestor.  (R. 242).  She was given continued diagnoses of obesity and hypothyroidism.  *Id.*

On July 19, 2006, Hilton presented to the OSU Family Clinic and reported that she continued to feel fatigued.  (R. 239-40).  She underwent cardiac assessment.  *Id*.  The doctor continued to diagnose that Hilton suffered hypothyroidism.  *Id*.  The doctor recommended that Hilton exercise and diet to lose weight.  (R. 240).

Hilton was seen on September 20, 2006 at the OSU Family Clinic for complaints of malaise and nausea.  (R. 235-36).  She reported that she had been trying to lose weight.  *Id.*  Her doctor noted she had pathological diet patterns.  (R. 236).

On October 4, 2006, Hilton was evaluated at Triad and diagnosed with left eye homonymous hemianopsia[2]. (R. 208-12, 273). She was scheduled for a February 28, 2007 brain MRI. *Id.* Results of the scans showed that Hilton had an "old" infarct[3] in the right frontal area, and had mild compensatory enlargement of the right frontal horn. (R. 200-01).

At Hilton's appointment at the OSU Family Clinic on November 16, 2006, she reported that she had occasional tingling in her buttocks and had continued to feel fatigued. (R. 233-34). She was diagnosed with obesity and a retroverted and sideverted cervix. (R. 233).

During Hilton's December 14, 2006 and January 18, 2007 appointments at the OSU Family Clinic, she reported that she felt stressed and "overwhelmed" because she had to manage the care of her family and her in-laws. (R. 229-32). She reported that Prozac helped her symptoms. (R. 229). She was diagnosed with moderate depression, hypothyroidism, and dyslipidemia[4]. (R. 232).

By referral of her physician, Hilton was seen on February 27, 2007, by Teri L. Bourdeau, Ph.D., at OSU's Behavioral Health Clinic. (R. 225-26). Hilton reported that she felt sad and overwhelmed by her required daily activities. (R. 225). Hilton reported that she had difficultly managing the medical appointments and the care of her children and her extended family. *Id.* In addition to Hilton's care for her child with Tourette's, she cared for her child with ADHD and for her husband who suffered from AIDS, paranoia, and anxiety. *Id.* She said she had difficulty

---

[2]Homonymous hemianopsia is blindness of the nasal half of the visual field of one eye and the temporal half of the other. Taber's Cyclopedic Medical Dictionary 871 (17th ed. 1993).

[3]"Infarct is an area of tissue that undergoes necrosis following cessation of blood supply." Taber's Cyclopedic Medical Dictionary 982 (17th ed. 1993).

[4]"Dyslipidemia is the abnormality in, or abnormal amounts of, lipids and lipoproteins in the blood." Dorland's Illustrated Medical Dictionary 586 (31st ed. 2007).

completing household chores.  *Id.* Dr. Bourdeau diagnosed Hilton on Axis I[5] with major depressive disorder, single episode, moderate.  *Id*.  She assessed Hilton's Global Assessment of Functioning[6] ("GAF") as 70.  *Id.*

Hilton presented to Dr. Bourdeau on March 6, 2007 and reported that her mood had significantly improved.  (R. 221).  Dr. Bourdeau observed that Hilton was happy and cheerful. *Id*.  She additionally noted that Hilton was appropriately dressed and that she had a good affect. *Id.* Dr. Bourdeau stated that Hilton's cognitive functions were within normal range and that she had showed no evidence of suicidal ideation*.  Id.*

Hilton was seen on March 7, 2007 for an osteopathic manipulative medicine outpatient (the "OMM Clinic") initial consult for low back pain.  (R. 222-23).  Hilton reported she had suffered back pain since she had been involved in multiple car accidents in the 1990s.  (R. 218, 222-23).  Hilton said her pain varied from 3 to 9 on a 0 to 10 scale, depending on her level of exertion.  *Id*.  The doctor assessed Hilton had parasthesias in both arms from the upper arms to the palms.  *Id*.  She was seen again on March 10.  (R. 218).

---

[5]The multiaxial system "facilitates comprehensive and systematic evaluation."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000).

[6]The GAF score represents Axis V of a Multiaxial Assessment system. *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32-36 (Text Revision 4th ed. 2000).  A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning."  *Id*. at 32.  The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas."  *Id*. at 34.  A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."  *Id*.  A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id*.

Hilton was seen at the OSU Family Clinic on March 12, 2007, and reported that counseling helped her manage symptoms of stress and the OMM Clinic treatments were helping. (R. 220).

Dr. Bourdeau wrote on March 13, 2007 that Hilton had a positive affect and had made significant improvement.  (R. 219).  Hilton reported that she felt better and that therapy had helped her symptoms.  *Id.*  Dr. Bourdeau reported that Hilton did not report any depression or suicidal ideation.  *Id.*  Dr. Bourdeau continued Hilton's Axis I diagnosis of major depressive disorder, single episode, moderate.  *Id.*  She recommended that Hilton attend weekly behavioral health sessions.  *Id.*

Hilton presented to the OSU Family Clinic on March 21, 2007 with complaints of increased fatigue, trouble initiating and maintaining sleep, frequent urgency to urinate, incontinence, chest pain and palpitations, dysphagia, weakness, and parasthesias.  (R. 216).  She reported Prozac had helped her symptoms.  *Id.*  The doctor assessed that Hilton suffered thyroid disease, fatigue, and hyperlipidemia.[7]  (R. 217).  The doctor wrote that Hilton's chest pain was due to her thyroid disease.  *Id.*

Dr. Bourdeau noted that Hilton had a positive affect during a April 3, 2007 appointment.  (R. 214).  She continued her previous diagnosis that Hilton had major depressive disorder, single episode, moderate.  *Id.*

Hilton was evaluated at Triad on April 4, 2007 and given continued diagnoses of left homonymous hemianopsia and glaucoma.  (R. 272).  Hilton was instructed to continue the use of Lumigan.  *Id.*

---

[7]Hyperlipidemia is an increase of lipids in the blood.  Taber's Cyclopedic Medical Dictionary 936 (17th ed. 1993).

At Hilton's June 20, 2007 first appointment at Family & Children Services ("FCS"), she was noted as being unkempt, sad, friendly, and tearful. (R. 311-34). Hilton reported that two to three times a day she got angry and yelled. (R. 315). She said that four to five times a week she had outbursts of anger. (R. 323, 327, 334). She had periods of sadness and would cry for "no good reason." *Id.* She had increased daily symptoms of low frustration tolerance and agitation. (R. 313). She felt she had become critical and argumentative. *Id.* Because her sleeping pattern had changed, she felt lethargic and tired daily. *Id.* She did not feel rested when she awoke. *Id.* The care of three disabled people was "too much"and she felt like the "walls were falling in" on her. *Id.* Hilton felt people talked about her when she was out in public. (R. 313, 315, 323, 334). She thought daily about her home catching on fire. (R. 311, 323, 334). Hilton had fleeting thoughts of suicide. (R. 315). Three to four times a month she saw things that others could not see. *Id.* She advised that fluoxetine was beneficial to treating her symptoms. (R. 326).

Hilton reported at the intake session that she felt depressed every day about her physical health. (R. 315). She struggled to have her medical needs met and to afford her medications. (R. 316, 318, 321). She reported that since 1990 she had chronic back pain, headaches, and frequent urination. (R. 314, 316, 323, 327, 334). She was noted as meeting the criteria for serious mental illness, and she was diagnosed with major depression, single episode. (R. 323, 334, 336). Hilton's GAF was scored as 50 both currently and for the highest for the past year. (R. 334, 337).

Hilton was seen at FCS on July 3, 2007, and she reported that she was full of rage and could not control her anger. (R. 309-10). She had hit her husband. *Id.* She spanked her children and regretted that. *Id.* She said that her chronic back pain increased her symptoms of anger. *Id*

At Hilton's FCS appointment on August 15, 2007, she reported that she was anxious,

depressed, and unable to sleep.  (R. 308).  She had been unable to fill her non-psychiatric medications because she had no insurance.  *Id.*  Hilton was given trazodone for insomnia and fluoxetine for depression.  *Id.*  On August 23, 2007, Hilton reported that she and her family members were concerned because she displayed daily symptoms of anxiety and short-term memory loss.  (R. 307).  On September 13, 2007, Hilton reported that medication had helped to decrease the level of her anxiety, but she still experienced daily symptoms.  (R. 306).

Hilton presented to FCS on January 25, 2008, reporting that she was not doing well and had been out of medication for several weeks.  (R. 426).  Hilton said she was out of her medication because she was too busy providing care for her family.  (R. 427).  She  was the primary caretaker of her family, and she experienced oscillating emotions of anger, meanness, moodiness, and depression.  *Id.*  Hilton had suicidal thoughts*. Id.*  She sometimes thought she could hear and see "stuff."  (R. 426)*.*  She had poor sleep, with decreased appetite and energy level.  *Id.*  Hilton reported that she attended stress management classes at FCS.  (R. 426).  Hilton said that she felt sedated on trazodone.  (R. 426-27).  She was prescribed Vistaril and continued on fluoxetine.  (R. 427).

On March 14, 2008 at FCS, Hilton said that she had a fluctuating appetite, poor sleep, and a decreased level of energy.  (R. 425).  She rated her depression as 6 on a 1 to 10 scale.  *Id.* Hilton stated that she felt like she was "slowly dying."  *Id*.  She felt stressed and overwhelmed as her family's only caregiver.  *Id.*  Hilton was described as having a blunted affect and as quiet, calm, and neutral.  *Id*.  Her doctor refilled her medications.  *Id*.  On April 11, 2008, Hilton said that she was doing well and was enjoying life "okay."  (R. 424).  She reported that she had low energy, poor concentration, and poor memory.  *Id*.  The doctor refilled her medications "for stability."  *Id*.  Hilton was diagnosed with depression with persisting fatigue.  *Id*.  On April 21,

2008, Hilton reported that her mood had improved, but she continued to have a low level of energy.  (R. 422).

At Hilton's June 10, 2008 appointment at FCS, she reported that she had mood swings, anxiety, and depression.  (R. 420-21).  She felt nervous, shaky, and agitated.  *Id.*  Her energy, motivation, sleep, and appetite were poor.  *Id.*  She was unable to get her household chores done.  (R. 420).  She had difficulty managing her anger and it had a negative impact on her family.  *Id.*  She was stressed by not having any income and having little food for her family.  (R. 421).  Hilton was hopeful her family would receive food stamps.  *Id.*  She reported that problems with her physical and mental health had kept her from working for three years.  *Id.*

Hilton presented to the emergency room at the OSU Medical Center on August 4, 2008 for complaints of chest pain, dizziness, nausea, and fatigue.  (R. 370-87).  She had an abnormal EKG, and she was admitted for observation.  (R. 372).  The discharge summary stated that the chest pain was resolved and was most likely related to depression and anxiety.  (R. 370).  Her discharge diagnoses also included hypothyroidism, obesity, menorrhagia, and history of anemia secondary to menorrhagia.  *Id.*

Hilton presented to the emergency room at the OSU Medical Center on October 13, 2008 with a complaint that she had experienced sharp, left-sided chest pain for five-days.  (R. 357, 366).  She was hospitalized overnight.  (R. 357-69).  In addition to the chest pain, Hilton reported that she had fatigue, weakness, dark stools, lightheadedness, blurry vision, headaches, and shortness of breath.  (R. 366).  Her discharge diagnoses were chest pain, anxiety, thyroid cancer by history, anemia, depression, history of internal hemorrhoids, hypothyroidism secondary to thyroidectomy, glaucoma, morbid obesity, dyslipidemia, and probable obstructive sleep apnea.  (R. 357).  The opinion of the physicians was that Hilton's chest pain was most likely secondary

to anxiety.  (R. 358).

The administrative transcript contains a treatment plan by FCS that appears to be dated August 25, 2009, but the plan is not signed and the pages are out of order.  (R. 454-55, 460-64). The Axis I diagnoses of this unsigned treatment plan were major depression disorder, recurrent, and generalized anxiety, and Hilton's GAF was 52.  (R. 454-55).

Hilton complained at her October 1, 2009 appointment at the OSU Family Clinic that her menstrual cycle lasted more than 10 days.  (R. 451).  She was diagnosed with menorrhagia, hypothyroidism, and morbid obesity.  (R. 452).

Agency consultant, Michael D. Morgan, Psy.D., performed a mental status examination of Hilton on May 8, 2008.  (R. 339-42).  Hilton stated that she was unable to work because she had glaucoma, depression, hypothyroidism, and thyroid cancer.  (R. 339-40).  In addition, she stated that she had back pain, severe headaches and chronic fatigue.  *Id*.  She reported that she had difficulty with her long-term memory, and difficulty understanding and retaining instructions.  *Id*.  She said she was unable to lift objects.  *Id*.  Hilton reported that the medication fluoxetine and counseling had helped her depression.  (R. 339).  She reported that she slept seven to eight hours with medication, but still felt fatigued.  (R. 340).  She had poor motivation and had occasional periods of dysphoria.  *Id*.  She reported that she maintained good relationships.  *Id.* Hilton told Dr. Morgan that she was able to provide care for her children, do household chores with rest, cook, play card games, watch television, and attend church services and choir practice. *Id.*  Dr. Morgan assessed Hilton's Axis I diagnosis as major depressive disorder, single episode, in partial remission.  (R. 342).  He assessed her current GAF score as 76-80.  *Id.*  Dr. Morgan determined that Hilton benefitted from the use of psychotropic medication and counseling.  *Id.* He believed that she would continue to improve or maintain by continuing treatment.  *Id*.

On May 23, 2007, agency consultant Tre' Landrum, D.O. completed a physical examination and report.  (R. 283-88).  Hilton advised Dr. Landrum that she had suffered daily chronic back pain for over 10 years and she had limited medical care.  (R. 283).  Hilton told Dr. Landrum that the 1990 car accident had caused nerve damage that made her hands and arms numb.  *Id*.  She had memory problems and depression.  *Id*.  On examination, Hilton's grip and toe strength were equal bilaterally, and she had no focal or sensory deficits.  (R. 284).  Hilton moved well, had a stable gait, and had full range of motion in her spine.  *Id.*

Agency consultant Phillip Gelwick, O.D., performed an ophthalmic examination of Hilton on June 18, 2007.  (R. 289-90).  Dr. Gelwick concluded Hilton suffered glaucoma and partial homonymous hemianopsia, due to head trauma.  (R. 289).  Hilton's vision could not be restored surgically or with treatment.  *Id.*  Dr. Gelwick observed that Hilton moved normally and easily around the room.  *Id.*

Non-examining agency consultant, Laura Lochner, Ph.D., completed a Psychiatric Review Technique form on June 21, 2007, concluding that Hilton's mental impairments were not severe.  (R. 292-305).  For Listing 12.04, Dr. Lochner noted Hilton's depressive syndrome.  (R. 295).  For the "Paragraph B Criteria,"[8] Dr. Lochner found mild limitations in the three categories of restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace, with no episodes of

---

[8]There are broad categories known as  the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment.  The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration.  Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") §12.00C.  *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

decompensation.  (R. 302).  Dr. Lochner noted Hilton's diagnosis of major depressive disorder,

single episode, moderate, and summarized her treatment by Dr. Bourdeau in early 2007.  (R.

304).

Non-examining agency consultant Sally Varghese, M.D., completed a second Psychiatric

Review Technique form on May 14, 2008, again concluding that Hilton's mental impairments

were not severe.  (R. 343-56).  For Listing 12.04, Dr. Varghese noted Hilton's depressive

syndrome.  (R. 346).  For the Paragraph B Criteria, Dr. Varghese again found that the three

categories all had only mild limitation and there were no episodes of decompensation.  (R. 353).

Dr. Varghese's summary provided that Hilton's complaints of depression were managed by

medication and treatment and that she had been responding well to medications.  (R. 355).  She

summarized the consulting examination of Dr. Morgan and noted that Hilton's activities of daily

living and adaptive functioning were intact.  *Id.*

### Procedural History

Hilton filed concurrent applications on March 28, 2007 seeking disability insurance

benefits and supplemental security income benefits under Titles II and XVI, 42 U.S.C. §§ 401 *et*

*seq*.  (R. 51-53. 434-42).  Hilton alleged onset of disability as March 15, 2005.  (R. 51).  The

applications were denied initially and on reconsideration.  (R. 28-32, 38-40, 443-49).  A hearing

before ALJ Charles Headrick was held June 24, 2009 in Tulsa, Oklahoma.  (R. 465-93).  By

decision dated August 27, 2009, the ALJ found that Hilton was not disabled.  (R. 15-25).  On

August 11, 2010, the Appeals Council denied review of the ALJ's findings.  (R. 5-7).  Thus, the

decision of the ALJ represents the Commissioner's final decision for purposes of further appeal.

20 C.F.R. §§ 404.981, 416.1481.

### Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim.  20 C.F.R. § 404.1520.[9]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g).  This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v.*

---

[9]Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

*Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

The ALJ found that Hilton's date last insured was December 31, 2010. (R. 17). At Step One, the ALJ found that Hilton had not engaged in any substantial gainful activity after her alleged onset date of March 15, 2005. *Id.* At Step Two, the ALJ found that Hilton had severe impairments of back pain, obesity, glaucoma, status post thyroid cancer, and anemia. *Id.* The ALJ discussed Hilton's depression and anxiety and concluded that they were not severe impairments. (R. 18-19). At Step Three, the ALJ found that none of Hilton's impairments met a Listing. (R. 19).

The ALJ determined that Hilton had the RFC to do the full range of light work. (R. 20). At Step Four, the ALJ found that Hilton was not able to perform any past relevant work. (R. 23). At Step Five, the ALJ found that there were significant numbers of jobs that Hilton could perform. (R. 24). Therefore, the ALJ found that Hilton was not disabled at any time from March 15, 2005 through the date of his decision. (R. 25).

**Review**

Hilton argues that the ALJ's decision should be reversed due to errors at Step Five, errors in the ALJ's credibility assessment, and error in the ALJ's consideration of Hilton's obesity. The undersigned finds that this case be reversed and remanded because the ALJ's decision is not sufficiently clear at Step Five.

<u>The ALJ's RFC Determination and Step Five</u>

Hilton makes several different arguments regarding the ALJ's RFC determination and his finding that there were significant numbers of jobs that Hilton could perform. The Court is most troubled by the ALJ's finding that Hilton could perform the entire range of light work even though she had undisputed restrictions to her field of vision. The ALJ noted that the consulting examiner Dr. Gelwick found "that [Hilton's] field of vision was abnormal with the widest diameter in degrees of remaining peripheral visual fields as 115 in the right eye and 68 in the left." (R. 23). In spite of his recitation of this finding by the consultative examiner, the ALJ nevertheless found that Hilton could perform the entire range of light work. (R. 20). The problem is that there is no substantial evidence to support the ALJ's apparent conclusion that Hilton's visual problems did not have any functional impact on her ability to work.

Dr. Gelwick's report merely stated the facts that Hilton had visual issues including an abnormal field of vision, and he did not give an opinion on any functional restrictions stemming from those issues. Hilton testified specifically that her loss of peripheral vision was one of the reasons why she couldn't work, and she stated that it affected her ability to drive. (R. 472-73). Given the objective medical evidence that Hilton had reduced vision, and her testimony that it affected her functional abilities such as her ability to drive, there was no substantial evidence supporting the ALJ's apparent conclusion that her reduced vision would not affect Hilton's

ability to perform the entire range of light work.  *Clark v. Barnhart*, 64 Fed. Appx. 688, 692-93

(10th Cir. 2003) (unpublished) (remanding in part for further consideration of the functional

impact of the claimant's uncontroverted reduced vision); *Kilinski ex rel. Kilinski v. Astrue*, 430

Fed. Appx. 732, 737 (10th Cir. 2011) (unpublished) (on remand, ALJ needed to assess

manipulative limitations in RFC due to claimant's testimony and objective evidence of arthritis

in thumb).

While Hilton's visual issues are the Court's primary reason for reversing the ALJ's

decision, the Court notes that the ALJ's decision at Step Five should be clarified in many

respects on remand.  At Step Five, the burden shifts to the Commissioner to show that there are

jobs in significant numbers that the claimant can perform taking into account his age, education,

work experience and RFC.  *Haddock v. Apfel*, 196 F.3d 1084, 1088-89 (10th Cir. 1999).  The

ALJ is allowed to do this through the testimony of a vocational expert ("VE").  *Id.* at 1089.  In

*Haddock*, the Tenth Circuit ruled that an ALJ must elicit testimony from a VE regarding whether

the VE's testimony conflicts with the Dictionary of Occupational Titles (the "DOT").  *Id.* at

1089-92.  If there is a conflict, the ALJ must investigate it and elicit a reasonable explanation for

the conflict before he can rely on the testimony of the VE.  *Id.* at 1091-92.

The ALJ found that Hilton could perform the full range of light work (R. 20), but then at

Step Five stated that the Grids[10] would direct a finding of nondisability if Hilton had the RFC to

perform the full range of light work.  (R. 24).  The ALJ then stated that Hilton's ability "to

---

[10]The Grids are the Medical-Vocational Guidelines set forth in 20 C.F.R. Part 404,
Subpart P, Appendix 2.  The Grids are based on the four relevant factors contained in the Social
Security Act: physical ability, age, education, and work experience.  They provide a "shortcut" of
rules that determine whether jobs exist in significant numbers that a claimant with certain
characteristics can perform.  *Daniels v. Apfel*, 154 F.3d 1129, 1132 (10th Cir. 1998); *Evans v.
Chater*, 55 F.3d 530, 532 (10th Cir.1995).

perform all or substantially all of the requirements of this level of work has been impeded by additional limitations."  (R. 24).  These conflicting statements leave the Court with some doubt about the ALJ's reasoning at Step Five.  Because the Commissioner has the burden at Step Five, this lack of clarity is troubling.

An additional problem at Step Five is that the ALJ included a table of the jobs that the VE testified Hilton could do, and one of those was "stock clerk," which was listed as a job performed at the "light" level.  (R. 24).  The DOT describes the "stock clerk" job as performed at the medium exertional level.  DOT #922.687-058, 1991 WL 688132.  As Hilton points out, the ALJ failed to inquire of the VE regarding any conflicts of his testimony with the DOT, as required as set forth in *Haddock*, 196 F.3d at 1087.  Hilton asserts several other factual problems with the VE's testimony, but the Court finds it unnecessary to address each in detail.  On remand, the ALJ should ensure that all of his reasoning at Step Five is clear, including all testimony by the VE, if he relies on VE testimony at Step Five.

To summarize, the undersigned finds reversal is required due to the lack of substantial evidence that Hilton's undisputed restricted vision would have no impact on the range of light work available to her.  Additionally, the ALJ's decision is not clear on several other points at Step Five, and all of those ambiguities should be clarified on remand.

Credibility Assessment

While the Court is remanding due to the issues discussed above, the ALJ's credibility assessment should also be addressed on remand.  Credibility determinations by the trier of fact are given great deference. *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations].
> Not only does an ALJ see far more social security cases than do appellate judges, [the

ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart*, 287 F.3d 903, 910 (10th Cir. 2001).  The ALJ must set forth "specific reasons for the finding on credibility, supported by the evidence in the case record."  SSR 96-7p, 1996 WL 374186 at *4; *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (in evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence).

While a claimant's credibility is generally an issue reserved to the ALJ, the issue is reviewable to ensure that the underlying factual findings are "closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."

*Swanson v. Barnhart*, 190 Fed. Appx. 655, 656 (10th Cir. 2006) (unpublished), *quoting Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005) (further quotations omitted).

The ALJ found that Hilton's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent" with the ALJ's RFC determination, and, in a footnote, he cited SSR 96-7p and quoted it at length.  (R. 21-22).  The remainder of his discussion, however, was minimal.  (R. 22-23).

The ALJ's first specific reason for finding Hilton less than credible was her activities of daily living as she described them to consulting examiner Dr. Morgan.  (R. 22).  The ALJ's conclusion was that "[a]ll in all, this sounds like an individual who maintains a relatively normal lifestyle."  *Id.*  One concern, however, is that Dr. Morgan was doing a mental status examination, and he included this discussion in a section of his report labeled "Social Functioning."  Therefore Dr. Morgan may have been emphasizing Hilton's social ability to do these activities more than her physical ability.  Likewise, the ALJ's statement is ambiguous in that it is not clear if he means "a relatively normal lifestyle," in that Hilton's social functioning is not severely affected by her depression and anxiety, or if he means that her activities of daily living are not affected by

the pain that she asserts is disabling.  This reviewing Court will not draw conclusions for the

ALJ, and he should make his reasoning clear on remand.  *Hamby v. Astrue*, 260 Fed. Appx. 108,

113 (10th Cir. 2008) (unpublished) (reversing in part because ALJ "failed to articulate his

reasoning [regarding credibility assessment] with sufficient specificity").

      The ALJ's next paragraph is his only one that specifically addresses Hilton's claims

regarding pain.  (R. 22).  Out of all of the rather lengthy longitudinal record, the ALJ cited to one

page, a progress record from the OMM Clinic  in March 2007.  (R. 218).  The ALJ wrote that

Hilton had reported that her pain was relieved by over-the-counter anti-inflammatory medications

and rest, that the physician stressed the need for Hilton to lose weight to relieve her symptoms,

and that the physician stated that Hilton's weight and bust were probably causing a large part of

her somatic dysfunction.  (R. 22).  First, the ALJ's description of this one page is selective,

because Hilton recited that her pain was a 7 on a scale of 1 to 10 that day, and the physical

examination found that she was very tender to palpation, two items not mentioned by the ALJ

that tended to support Hilton's claim of disabling pain.  *See Robinson v. Barnhart*, 366 F.3d

1078, 1083 (10th Cir. 2004) (An ALJ is "not entitled to pick and choose from a medical opinion,

using only those parts that are favorable to a finding of nondisability").

      Additionally, on the page cited by the ALJ, directly above the line stating that her pain

was relieved by medication, there is a statement that it was "provoked" by lifting and excessive

motion.  (R. 22).  Therefore, it appears that the word "relieved" in this context may have been

simply a statement that Hilton's pain was improved if she used over-the-counter pain relievers

and if she rested, and her pain was aggravated if she lifted items or moved too vigorously, and

the ALJ's selective quoting leaves out this context.  In any case, the ALJ never ties his

description of this one encounter to his credibility assessment.  In the absence of an affirmative

discussion of why this evidence led the ALJ to decide that Hilton was less than credible, the

reviewing Court is left with nothing to review.  *See Hardman v. Barnhart*, 362 F.3d 676, 678-81

(10th Cir. 2004).

The next several paragraphs appear to be descriptions of medical evidence that again do

not include any explanation for why they are significant to an analysis of whether Hilton's claims

of disabling pain were credible.  (R. 22-23).  After these paragraphs, the ALJ included a

summary:

> [The ALJ] does not discount all of the claimant's complaints.  In view of her back
> pain, obesity, glaucoma, status post thyroid cancer, and anemia, she would
> undoubtedly have some difficulties.  However, there is no evidence that any of the
> claimant's treating physicians have told her she is disabled and should do nothing
> all day.  Given the objective medical evidence in the record, [the ALJ] finds that
> [Hilton's RFC] is reasonable, and that [Hilton] could function within those
> limitations without experiencing significant exacerbation of her symptoms.

(R. 23).  This provision is largely a boilerplate statement, and it does not illuminate any reasons

why the ALJ found Hilton's claims of disabling pain were less than fully credible.  *Hardman*,

362 F.3d at 678-81.

On remand, the ALJ should make a thorough analysis of Hilton's subjective complaints

of disabling pain, including a discussion of the factors listed in 20 C.F.R. § 404.1529(c) and §

416.929(c).  *Sitsler v. Astrue*, 410 Fed. Appx. 112, 117 (10th Cir. 2011) (unpublished); *Hamby*,

260 Fed. Appx. at 113.

Because the undersigned finds that other issues require reversal, the undersigned has not

addressed the contentions Hilton has made regarding the ALJ's consideration of her obesity.  On

remand, the Commissioner should ensure that any new decision sufficiently addresses all issues

raised by Hilton.

The undersigned emphasizes that "[n]o particular result" is dictated on remand.

*Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993).  This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case.  *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

### Conclusion

For the reasons stated above, the Court reverses the decision of the Commissioner and remands for further proceedings consistent with this Opinion and Order.

Dated this 7th day of December, 2011.

Paul J. Cleary
United States Magistrate Judge